JAMES H. GOODSELL *vs.* HANCE LAWSON, MICHAEL SOMERS, WILLIAM H. ROACH and THOMAS H. DIXON.

*Commissioner of the Land Office—Jurisdiction of a Court of Equity over proceedings pending before the Commissioner of the Land Office—Landlord and Tenant—Estoppel—Riparian Rights—Construction of sections 37 and 38, of Article 54, of the Code—Effect of a Conveyance of a Lot of ground in a Town, by reference to the Town Plat.*

The complainants filed their bill in Equity alleging their title to, and possession of, the tract of land called "Honesty," lying contiguous to the waters of the Annamessex River, a navigable stream, and that as an incident to that title and possession they were entitled to all accretions, &c.; and to the exclusive right of making improvements into the water in front of their land. That in pursuance of their riparian and other rights, they had located upon their said land and the water in front thereof a town, and

Goodsell *vs.* Lawson, *et al.*

laid it out in lots and streets, had built piers and projected improvements into said water, with a view to advance the commercial prosperity of the place, and that business and population had rapidly increased, and the property had become very valuable. That in 1867, they or those to whose rights they had succeeded, agreed in writing to permit the respondent to have a location for the purpose of carrying on the oyster packing business in the water in front of their said lands, and to lease the same to him for ten years, he on his part agreeing to distribute the shells which he should make in the prosecution of his business in the water on said premises, so as to fill up the same and reclaim it for building and other purposes, and also, if a surplus of shells remained after filling up and reclaiming the premises occupied by him, then such surplus to be applied to the filling up and reclaiming the adjoining premises belonging to the complainants. And that the improvements which the respondent agreed to make in said waters, he was to enjoy and use for the said ten years, and then deliver up to the complainants as their property. That in pursuance of said agreement he entered upon said lot, built his pier by the use of shells which had accumulated in the prosecution of his business, reclaimed from the water the lot occupied by him, and also a part of the adjoining lot, without ever making claim thereto, other than by the agreement aforesaid; and that for the first time in 1871, the complainants became aware of his intention to question their title by his instituting proceedings in the Land Office to obtain a patent for these improvements. They further alleged that these proceedings of the defendant were a fraud upon them, derogatory to their riparian title, casting a cloud thereon, and injurious to the value of their property, and they prayed that their title to the land might be declared, that they might be quieted in the enjoyment of the same, and for an injunction. The material allegations of the bill were either admitted or proved. HELD:

1st. That the bill presented a case within the jurisdiction of the Court.

2nd. That the complainants had no remedy at law adequate to the exigencies of the case.

3rd. That the pendency of proceedings for a patent before the Commissioner of the Land Office with a view to obtaining a patent, whether upon a caveat or otherwise, does not oust the jurisdiction of Chancery over the same subject-matter.

4th. That the doctrine of estoppel applied to the defendant between whom, and the complainants, the facts established the relation of landlord and tenant.

5th. That the complainants under Article 54, section 38 of the Code, had the exclusive right of making improvements into the waters in front of their

lands. That such improvements when made belonged to them as an incident to their estate; and this was a valuable right which other persons could not lawfully destroy or interfere with.

6th. That in the exercise of this right of improvement the riparian proprietor is not restricted, except by the provision, "that the improvement so made shall not interfere with the navigation of the stream of water into which the said improvement is made."

7th. That the law which applies to riparian proprietors upon waters not navigable, and which defines their proprietary rights by the thread of the stream has no application to navigable waters, and the Code (Art. 54, secs. 37 and 38,) is not to be construed so as to apply this doctrine to improvements in navigable waters.

8th. That in making the improvements the proprietor is not compelled to commence them at the shore, but may begin at the outer extremity of the projected improvement and extend the same to the bank of the river.

9th. That the title to the improvement when made may be severed from that to the mainland, and be conveyed to, and held by other persons having no interest in the original tract.

10th. That a conveyance by metes and bounds of one of the lots so laid out by the complainants, as "a lot of ground in the Town of Crisfield, being part of block No 19 on the plat of said Town," must be construed with reference to said town plat; and that plat showing that no riparian rights were conveyed or intended to be conveyed by the deed, none such will pass to the grantee, although at the date of the deed the lot was upon the water.

APPEAL from the Circuit Court for Somerset County, in Equity.

The facts of the case are fully set forth in the following opinion delivered by the Court below, (FRANKLIN and IRVING, J.):

"The complainants, by their bill, allege that they are the owners in fee simple of a tract of land in Somerset County, on the Little Annamessex River, called 'Honesty,' which was granted to Hance Lawson and Michael Somers by the State of Maryland, on or about the 13th of June, 1858, the title to which, by mesne conveyances, has become vested in them. That the said tract of land, from the end

of its first course, binds upon the navigable waters of Little Annamessex River, and that the said patentees and their alienees, by virtue of the said grant, became entitled to all accretions to the said land by recession of the waters of said river or made by natural causes or otherwise, and to the exclusive right of making improvements into the water in front of said land. They further allege, that the said Hance Lawson and Michael Somers, the original patentees, together with John W. Crisfield, who, at that time, was a joint owner with them of the said tract of land with a view to the improvement of the property, had the same surveyed and with the contiguous water, which it was proposed to use in connection with the land, for the purposes of commerce and trade, laid out into streets and town lots, and called it 'Crisfield.' That the plat of the said town was caused to be recorded among the land records of Somerset County, and all subsequent improvements were laid out and controlled by it. That they sold a part of said property to the Eastern Shore Railroad Company, for the purposes of their business, and in 1866, erected a pier themselves in front of their said land, which they leased to one Nathaniel Dixon. That on the 24th day of May, 1867, John W. Crisfield, acting for himself and his co-tenants and with their consent, entered into an agreement in writing with the respondent to permit him to occupy and use a position in the water in front of said complainants' property, adjoining the pier leased to Dixon, to build a pier thereon for the purpose of the oyster trade, in which he was about to engage, and to lease the same to him for ten years, he, on his part, agreeing to distribute the shells which he should make in the prosecution of his business in the water on said premises, so as to fill up the same, and reclaim it for building and other purposes, and also if a surplus of shells remained after filling and reclaiming the premises occupied by him, then such surplus to be applied to the filling up and reclaiming the

adjoining premises which had been leased to Dixon. They further allege, that they and those under whom they claim, have in all respects performed their part of the said agreement; and that the respondent, in pursuance thereof, entered upon the said premises, erected his pier, commenced to prosecute, and is still extensively prosecuting the oyster business, and from the shells arising therefrom, has filled up and reclaimed from the water, a large space of the lot mentioned in the said agreement, and also of the adjoining lot, upon which many valuable buildings have been erected, and a large and growing commercial business established. But that in July, 1871, they discovered that he had sued out of the Land Office, a special warrant of survey, and laid it on those lots which had been reclaimed from the water by the deposit of shells aforesaid, claiming it to be vacant land. They further charge, that by themselves and their tenants, they are in full possession of the tract of land called 'Honesty,' and its appurtenances, with some few exceptions, having no bearing on this case, subject only to the lease of Dixon and some others for short terms, and to the agreement with the respondent aforesaid; and that, having the right to all accretions, whether natural or otherwise, and as an incident to their ownership of 'Honesty,' the exclusive right to make improvements in the waters in front thereof, the proceedings of the respondent in suing out and prosecuting a warrant of resurvey from the Land Office, for the purpose of procuring a patent for the land thus made and reclaimed, is a fraud on the Land Office. That they were instituted with the fraudulent intent and purpose, and in fact do defraud and injure the complainants, cloud and entangle their title and impair the value of their property, and they ask that their title to the said land may be declared, and that they may be quieted in the enjoyment of the same. That the respondent may be restrained, &c.

"The answer of the respondent, taken in connection with the agreement filed in the cause, relieves the Court of all difficulty as to the facts. Most of the material allegations of the bill are either admitted or not denied; and as to those which are denied, the proof leaves them free from doubt. The title of the complainants to the tract of land called 'Honesty,' its contiguity to the water in question, its true location, the leases and improvements in the water in front of it, and the general plan of the town of Cris-field, the execution of the agreement marked ' Ex. H.' and the entry of the respondent under that agreement, and his acts in virtue thereof, which resulted in the raising from the water, the parcel of land now in question, the location of that parcel of land adjoining the Dixon lot, and in front of the tract called ' Honesty,' the application by the respondent for a warrant to resurvey the same as vacant land, and the certificate of resurvey made at the instance and in the name of the respondent, are facts, of which the admissions and evidence in the cause have fully satisfied the Court.

" The respondent, while he admits the execution of the agreement marked 'H,' denies any knowledge of Mr. Crisfield's having acted as agent for others in making said contract, and objects to the legal effect thereof, as set forth in the bill. He further denies the fraudulent intent with which he is charged to have begun and prosecuted his proceedings in the Land Office, and that the effect of those proceedings will be injurious to any of the rights of the complainants. The counsel seem to have properly divested the case, as far as possible, of all questions of fact, in order that the legal questions involved might be considered by the Court, with as little embarrassment as possible.

" Three points were raised in the argument, and very ably discussed by the counsel on both sides, in the follow-ing order:

"1st. What are the rights of the complainants to the premises in question?

"2nd. How far is the defendant estopped by his contract of May 24th, 1867, and his acts in pursuance thereof, from controverting the complainants' title?

"3rd. Has this Court jurisdiction in the premises?

"Inverting the order of the discussion, we will consider the last proposition first.

"On the part of the defendant, it was urged that he had epplied to the Commissioner of the Land Office for a patent for the land in question, of which application the complainants had full notice, as appears from their bill, and that in fact they had filed a caveat against his application which is now pending. That the Commissioner of the Land Office is a Court of record, empowered to decide all disputes concerning the issuing of patents, according to equity and good conscience, and the principle established in Courts of Equity, from whose decisions an appeal lies to the Court of Appeals; and that in the case now pending there, the whole subject can be examined, and the questions involved in this case can be finally decided. In other words, that the complainants, by prosecuting their caveat before the Commissioner of the Land Office, can have all the relief to which they are entitled by this bill. Is this position tenable?

"The Land Office has always been, and is now the general market in which all public lands have been offered for sale. Its function is to confer on its patentee all the title of the State to the property granted. By its action it cannot take away or prejudice the vested rights of others. Even after a caveat, in which questions of title are examined, a patent to the caveatee will confer no title as against the caveator; but the latter may again assert his title in a Court of Law or Equity, in the face of the patent. According to a well recognized rule of the Land Office, it was the practice in cases of reasonable doubt, to let the

patent go, so that the rights of the parties might be settled in the proper tribunal, and in one case of cross-caveats, the Chancellor actually issued a patent to each claimant. *Baltimore vs. McKim*, 3 *Bland*, 455; *Railroad vs. Hoye*, 2 *Bland*, 263; *Dorothy vs. Hillert*, 9 *Md.*, 570; *Smith's Lessee vs. Devecmon*, 30 *Md.*, 473.

" It is true, the reason for this rule was generally said to be, that, as there was no appeal from the decision of the Chancellor as Judge of the Land Office, it was better in doubtful cases, to permit the party to perfect his legal title, so as to allow the matter to be brought before some tribunal where a more full and satisfactory investigation can be had, and a final decision by the Court of Appeals. But in the case of *Dorothy vs. Hillert*, above cited, the appeal was taken from a decision of the Commissioner of the Land Office, under the Act of 1853, ch. 415, which confers the right of appeal; yet the Court re-asserts the same rule, with the suggestion, that the reason upon which it is based, has not the same force since the passage of that Act as it had before. It is not now necessary for the Commissioner to be so cautious, but in proper cases, should be governed by the same rule. The case of *Smith's Lessee vs. Devecmon*, also referred to above, seems to place the matter beyond further argument. There, Smith having obtained a special warrant of escheat which was duly returned, examined and passed, and the composition money paid—a caveat was filed by Devecmon to prevent his obtaining a patent. The caveat was sustained, and Smith, instead of appealing as he might have done under the Act of 1853, ch. 415, applied for and obtained an Act of the General Assembly, directing a patent to issue to him—a patent for the same land having been previously issued to Devecmon by the Commissioner of the Land Office. Smith sued for the land, claiming title under his previous patent, issued by order of the Legislature, against the patent of Devecmon issued by the Com-

missioner of the Land Office, in the regular course of
proceedings, after a hearing between the same parties, in
which their rights were fully adjudicated, at least, so far
as that tribunal had power to settle them.   It was urged
with great force, that the Act of the Legislature was
judicial, and therefore void, and that Smith's only remedy
was by appeal from the decision of the Commissioner of
the Land Office.   The Court, however, said, 'it is true
that the 1st section of the 54th Article of the Code, makes
the Commissioner of the Land Office a Court of Record,
but the 7th Art. of the Constitution of 1864, section 3, in
providing for the election of that officer, leaves his powers
and duties completely under the control of the Legislature,
so that they may be changed or abrogated, and new duties
imposed at its will and in its discretion.   That officer does
not form part of the judiciary under the Constitution of
1864.   After the revolution, the Legislature of this State
succeeded to the rights and powers of the Lord Proprietary
over the public lands, to be exercised for the public good,
and can dispose of them upon such terms, and under such
regulations as it may deem proper and expedient, and can
change, modify or dispense with such rules and regulations,
in particular cases, according to its own notions of justice
and expediency.   It was the well established practice of
the Chancellor, as Judge of the Land Office, where there
were two applicants for patents, to issue patents to both, in
cases of doubt, so as to place them in a position to have
their rights determined by the Courts, and the Act of 1866
does no more.'   Its effect was " a repeal, *pro tanto,* of the
Act of 1853.'

   " The Constitution of 1867, Art. 7, sec. 4, creating the
Commissioner of the Land Office, is identical with that of
1864, so far as relates to this subject, and must receive the
same construction.   The Court sustained, to the fullest
extent, the power of the Legislature to . order a patent to
issue, notwithstanding the decision of the Commissioner

of the Land Office; but at the same time decided that neither the action of the one, nor the other was conclusive. It is clearly deducible from these authorities that the Commissioner of the Land Office, while he is a creature of the Constitution, and is declared to be a Court of Record by the Code, does not form a part of the Judicial Department of the Government. He is rather an arm of the Legislature, just as the Chancellor as Judge of the Land Office was of the Lord Proprietary, invested with authority to grant, under certain rules and regulatians, the public domain to purchasers, and clothed with a *quasi* judicial power to decide such questions as might incidentally arise in the discharge of his duties as agent for the Government in the sale of its lands. The very language of the Code declaring it to be a Court of Record ' with the same powers to preserve order, punish contempts and enforce obedience to its orders and adjudications,' shows that the intention was merely to give a power of self-protection, which is inherent in all Courts of Record without legislation. No additional authority or more extensive jurisdiction is conferred upon it. Its acts done within the scope of its powers, and in accordance with the rules prescribed for its guidance, are binding upon the State, but individuals in the settlement of their conflicting rights are not concluded by its action. Before the Act of 1853, there was no appeal from its decisions, but we have seen by the case of *Smith's Lessee vs. Devecmon*, that that Act made no change in the character or the jurisdiction of the tribunal. It derogated nothing from the power of the Legislature over its proceedings, and added nothing to the dignity or binding force of its decisions. No suitor was obliged to avail himself of that Act, but might pursue any other remedy which he could have adopted before the Act was passed. The Land Office stands now as it ever has, a department of the Government, organized to superintend the disposition of the public lands under such rules and regulations as the Legis-

lature may from time to time prescribe for the government of its Commissioner, with no power to him to adjudicate questions of title between individuals, so as to be conclusive on them when litigating in the Courts of the State. If this be the true view of the nature and powers of the Commissioner of the Land Office, it follows that no suitor can be debarred from prosecuting a case in any of the Courts of the State involving the title to land, because of the pendency of a caveat in the Land Office, which involves the same questions between the same parties, or because he might raise the same questions by filing a caveat before the Commissioner against the granting of a patent for the same land. If the decision of the case by the Commissioner would not prevent him from asserting his claim in another tribunal, certainly the mere pendency of such a case could have no such effect. The objection to the jurisdiction of this Court cannot therefore be maintained.

"We have given more space to this point than might otherwise have been necessary; but it seemed to be called for, because this was the only objection insisted upon in the argument, and was urged with much zeal and ability. Our decision, however, leaves still open the general question of jurisdiction, and its determination depends exclusively upon the case made by the bill. For this purpose, we cannot have recourse to the statements of the answer, or to any other part of the proceedings. *Ridgeway vs. Toram*, 2 *Md. Ch. Dec.*, 308. The bill, as we have seen, alleges title and possession on the part of the complainants, of the tract of land called 'Honesty,' lying contiguous to the waters of the Annamessex River, a navigable stream in Somerset County, and that as an incident to that title and possession, they are entitled to all accretions, &c., and to the exclusive right of making improvements into the water in front of their said land. That in pursuance of their riparian and other rights, they have located upon their said land, and the water in front thereof, a town, and

Goodsell *vs.* Lawson, *et al.*

laid it out in lots and streets, have built piers and projected improvements into the said water, with a view to advance the commercial prosperity of the place, and that business and population have rapidly increased, and the property has become very valuable. That in 1867, they, or those to whose rights they have succeeded, agreed in writing to permit the respondent to have a location for ten years, for the purpose of carrying on the oyster packing business, in the water in front of their said lands, upon certain terms therein stated, and which we have before set out, and that the improvements which he agreed to make in the said water, he was to enjoy and use for the said ten years, and then deliver them up to the complainants as their property. That in pursuance of said agreement, he entered upon said lot, built his pier by the use of shells, which had accumulated in the prosecution of his business, reclaimed from the water the lot occupied by him, and also a part of the adjoining lot, without ever making claim thereto, other than by the agreement aforesaid; and that for the first time, in 1871, the complainants became aware of his intention to question their title, by his instituting proceedings to obtain a patent for these improvements. They further allege, that these proceedings of the defendant are a fraud upon them, derogatory to their riparian title, casting a cloud thereon, and injurious to the value of their property.

"Conceding these allegations to be true, and that the complainants have the exclusive right to make improvements into the water in front of their land, what is the attitude of the defendant before this Court? If the right of a party is exclusive, it cannot be interfered with without his consent. Mr. Goodsell had no more authority to place any impediment in the way of the free and exclusive enjoyment of the complainants' use of the water in front of his land, than he would have had to build a wall on the land itself, and thus cut them off from the water. He could do

either by the consent of the owner, and only by his consent. But he will not be permitted to avail himself of these acts, done under license from the owner, to maintain a title against that owner. This would be taking an unconscionable advantage of an agreement, which was never contemplated by the parties, and would work a legal fraud. In this case, Mr. Goodsell could not have patented this land at the time the agreement was entered into, because it was covered by navigable water. *Act of* 1862, *ch.* 129. Neither could he have erected his pier, or deposited his shells there without infringing the rights of the complainants. This he did by their license, (as he only could legally do,) and with an express agreement to deliver to them the possession of the place, and the improvements thus made after a limited enjoyment by himself. That which he did under this license, resulted as was intended, in the making of a parcel of fast land. This might have been accomplished by the complainants themselves, in which case no one would have questioned their title. The work was actually done by Mr. Goodsell by their authority, under their direction and for their benefit, for a consideration by way of temporary enjoyment moving to him. Can that change the relative rights of the parties? And now Mr. Goodsell having a claim solely upon his own acts, which he had no right to do, save by the leave of the complainants, seeks to obtain a patent from the State, for the result of his acts, which will not impair, but destroy those very riparian rights under which he was acting. The bare statement of the facts is all that is necessary to call forth the denunciation of a Court of conscience.

"But it is said that all this may be true, and yet the complainants can have their redress at law, and therefore are not entitled to the relief they have asked of this Court. It is difficult to see by what proceeding prior to the issuing of a patent, the law would afford the complainants

any remedy. No action would lie for damages for building the pier, or dumping the shells into the water, because it was done by their permission; and even if it were otherwise, damages would be a very inadequate remedy for an interference with a right like this, which would amount to its destruction. If the patent should issue, and the party were to bring ejectment for the premises, he would still be met with the agreement to lease conferring the right of possession as against the plaintiffs, and his remedy be postponed until the expiration of the time for which the property was agreed to be leased, if, indeed, he would have any remedy by ejectment at all. *Casey vs. Inloes*, 1 *Gill*, 497. In the meantime, the cloud hanging over the title would prevent the sale or lease of other lots similarly situated, hinder the growth of the town, foster a multiplicity of suits, and greatly impair the value of the property. So far as the allegations of the bill shew, there has been no breach of the agreement for which an action at law might be instituted, in which the question of title could be tried, and this Court can see no remedy at law which is adequate to the exigencies of the case.

"It seems always to have been considered, that proceedings in the Land Office were of an equitable character, and the Code provides, that the Commissioner shall be governed by the principles and practice of Courts of Equity. That his decisions might be reviewed in the Court of Chancery, by original bill was early settled. *West vs. Jarrett*, 1 *H. & J.*, 538. If reviewed, they may be reversed, and a patent annulled; *a fortiori*, a Court of Chancery can interpose its restraining authority to prevent that which after it is done, it can annul. We think therefore, because, in connection with other circumstances, the bill alleges fraud, because there is no adequate remedy at law, and because the complainants are entitled to have the cloud upon their title removed, which the defendant has placed upon it, we must entertain jurisdiction in this case.

" This brings us to the consideration of the complainants' rights in the premises, for until they are established they cannot call into exercise the remedial powers of this Court. Their ownership of the land bounding on Annamessex River, in front of which the land sought to be patented has been made, cannot be doubted. The river is navigable water. What are their rights as riparian proprietors ? The Act of 1862, ch. 129, has materially changed and enlarged the rights of the proprietors of lands bounding on navigable water, and to the proper understanding of that Act, it is necessary, first to ascertain what those rights were previously, both as to land adjoining waters navigable and unnavigable.. The grant of a tract of land bounding on the sea or any navigable water conveyed no right to the grantee to the land below high-water mark. From that point it belonged to the Sovereign, and while it might be granted to a citizen by express words, subject to the *jus publicum* of navigation and fishing, it did not pass as an incident to the ownership of the adjacent land. Any increase of the soil, however, formed by the waters gradually or imperceptibly receding, or any gain by alluvion in the same manner as a compensation for what it might lose in other respects, would belong to the proprietor of the adjacent or contiguous lands. *Giraud's Lessee vs. Hughes*, 1 *G. & J.*, 249. In this last respect there was no difference between waters navigable and not navigable. As to the former, the riparian owner had no right whatever at common law to make improvements into the water in front of his land. Laws have, however, been passed from an early period of our history, conferring such rights to a limited extent, and their construction by our Courts will throw much light on the subject now under consideration.

" In the case of non-navigable streams, the riparian owner was, and is still, entitled to the bed of the stream *ad filum medium aquæ.* Thus not only accretions, but all

formations rising above the water on his side of the middle line, whether natural or artificial, connected with the shore or otherwise, belong to him. The withdrawal of the water neither increases nor diminishes the validity of his title nor changes it in any respect. It merely changes the character of that which was his before, and enables him to subject it to uses of which it was previously incapable. *Browne vs. Kennedy,* 5 *H. & J.*, 205. In this condition of the law the Act of 1862, ch. 129, codified as Art. 54, secs. 37, 38 and 39, was passed. These sections are as follows:

"37. 'The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed, or made by natural causes or otherwise in like manner, and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable.

"38. 'The proprietor of land bounding on any of the navigable waters of this State, is hereby entitled to the exclusive right of making improvements into the waters in front of his said lands. Such improvements and other accretions as above provided for, shall pass to the successive owners of the land to which they are attached as incident to their respective estates. But no such improvement shall be made so as to interfere with the navigation of the stream of water into which the said improvement is made.

"39. 'No patent hereafter issued out of the Land Office, shall impair or affect the rights of riparian proprietors, as explained and declared in the two sections next preceding this section, and no patent shall hereafter issue for land covered by navigable waters.'

"Thus, while formerly the owner of land adjacent to navigable water had only the right to the accretion, according to the technical meaning of that word, namely: any increase of the soil formed by the waters gradually or imperceptibly receding, or by alluvion in the same manner;

now by the 37 sec. of the codified Act of 1862, he is upon the same footing in that respect as the owner of land bounding on water not navigable. We are not prepared to go to the extent claimed by the counsel for the complainants in the construction of this section. We do not think it gives the riparian proprietor a title to the bed of the adjacent stream *ad medium filum aquœ.* That would involve consequences which were never contemplated by the framers of the law, and is by no means warranted by the language they have used. The accretions alone are intended to be affected, not the bed of the stream before such accretions are formed. As to them, his rights are certainly enlarged, but to what extent it is not now important to enquire. The decision of this case will rest mainly upon the plain language and intent of the 38th section. That places his right of making improvements into the water in front of his land upon a firm basis. It is a new right never accorded before, and is further hedged around by an inhibition upon the State herself against ever issuing a patent for land covered by such water. Previously a person's right to the accretion or even to make improvements under laws then existing, might be practically destroyed by a grant from the State for the land covered by the water adjacent to his premises. This power of the State, however, was seldom exercised when it endangered riparian rights, and it was recognized by the Chancellor, in the case of *Chapman vs. Hoskins,* as a sufficient equitable reason why he should refuse to grant a patent—it appearing that the land included in Mr. Hoskins' survey was gradually rising from the water, and that the patent would prevent Chapman's riparian right from attaching, when it should, if ever, emerge. The reasoning of the Chancellor was referred to by the Court of Appeals, in *Patterson, et al. vs. Gelston,* 23 *Md.,* 448, and applied in that case, although the power of the State to issue the patent was fully recognized. This equitable principle applied by

Courts of Chancery to protect the citizen against an abuse of power clearly residing in the State, has now, in the Act of 1862, assumed the force of a Statute, which must be construed in furtherance of the spirit which led to its enactment. Statutes, similar in their nature, though not so extensive in their operation, have been passed long before the Act of 1862, and have received constructions from the Courts, which will much assist us in the present inquiry. The Act of 1745, ch. 9, in reference to the town, now City of Baltimore, declares, ' that all improvements of what kind soever, either wharves, houses or other buildings that have or shall be made out of the water, or where it usually flows, shall, as an encouragement to such improvers, be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever.' In speaking of the rights conferred by that Act, the Court of Appeals say, ' the right of extending her lot, or wharfing out to the city dock, under the Act of 1745, and the ordinances of the City of Baltimore, was a franchise, a vested right, peculiar in its nature—a *quasi* property, of which the lessor of the plaintiff could not be lawfully deprived, without her consent. And if any other person, without her authority, made such extension, no interest or estate in the improvement vested in the improver, but it became the property and estate of the owner of the franchise.' *Casey's Lessee vs. Inloes*, 1 *Gill*, 501. In the same case, on page 500, they say, that the act of the improver was a mere trespass.

" It cannot be that the riparian rights conferred by the Act of 1862, are not at least as extensive as those arising under the Act of 1745, as expounded by the Court of Appeals. But the affirmative right, given by the former Act, is further protected by the provision in the 39th section, that ' no patent shall hereafter issue for land covered by navigable waters,' and that no patent hereafter issued out of the Land Office shall impair or affect the rights of

riparian proprietors, &c.   The complainants in this cause,
then, as owners of the tract of land called 'Honesty,'
have the exclusive right to make improvements into the
waters of the Annamessex River, in front of their said
land.   This is a vested right, a *quasi* property, of which
they cannot be lawfully deprived without their consent;
and if any other person make such improvement with-
out their authority, such person is a trespasser, and the
improvement becomes the property of the owner of the
adjacent land.

   " But it was urged in the argument by the defendant's
counsel, that conceding the rights of the complainants, as
above stated, they have by their deed to Isabella F. God-
man, of May 6th, 1871, granted to her a lot, the location
of which, as appears by the plat, entitles her to riparian
rights, which conflict with those claimed by them.   In
other words, this lot on its north side has a water-front,
and the principles above set forth would entitle its holder
to extend into the water improvements in front of it, which
would cross the line of improvement claimed by the com-
plainants, and cut off their shore from the land now sought
to be patented by the defendant.   That this effectually
annuls any interest which the complainants might other-
wise have in the premises in controversy, and they there-
fore have no standing in Court.   This objection cannot be
sustained.   The lots of the town of Crisfield are laid off
in part on the water.   Streets and basins, and all the
appliances for a commercial site are provided.   It cannot
be supposed for a moment, that the owners of the pro-
jected town intended to confer on the purchasers of lots, to
be created from the water, riparian rights, such as we have
been considering.   Often the lots would be situated at
right angles to each other, and the claims of the owners
would conflict, streets could be thus occupied, and the
whole plan of the town frustrated.   This lot is partly on
the land and partly in the water, and is located with

reference to the town plat. It must therefore be construed with reference to that plat, and the designs therein manifested. It will be seen also by an examination of the deed, that it does not call for a water line. The description is by courses and distances, and these must circumscribe the title of the purchaser. In *Browne vs. Kennedy*, cited above, Carroll, who owned both sides of Jones' Falls, in conveying the land on the north side called for the stream. Even then the Court was divided as to whether he conveyed riparian rights to his vendee, or whether the title to the bed of the stream still remained in him. If, instead of calling for Jones' Falls, and bounding the land sold by it, he had described it by course and distance, there can hardly be a doubt, but that the purchaser would have been confined within the lines expressed in his deed.

"Much stress was laid upon the fact that the agreement to lease, executed on the 24th day of May, 1867, by Mr. Goodsell and J. W. Crisfield, was executed by the latter individually, and not as agent for the other owners. In the view we have taken, it can make no difference. If Mr. Goodsell made the improvement which he now seeks to patent, in front of the complainants' land without their authority, he was a trespasser, and no act of his can impair their right to make any improvement they may desire in the same locality, much less enable him to avail himself of his own wrong to destroy that right. We will however, say that the evidence convinces us that Mr. Crisfield in making that agreement, was acting not only for himself, but by authority of his co-tenants in their behalf, and that Mr. Goodsell, if he was really ignorant of the fact, had ample knowledge, from his former transactions with the parties about the same subject-matter, to have directed him to such a conclusion. His dealings with them soon afterwards, show that he was not long in ignorance. The subsequent ratifications of the co-tenants is abundantly proven, and they have forever barred themselves from dis-

puting it by this proceeding. It was further urged, that upon the theory of the complainants' counsel, they could only go *ad medium filum aquœ*, when, in point of fact, they had gone beyond the middle of the stream, and thus encroached upon the rights of the owner of the land on the opposite side. It is difficult to determine from the plats whether this be true or not, but it is immaterial. We have not based our opinion upon the 37th section of the 54th Article of the Code, but mainly on the 38th, which confers the right of making improvements, &c. The only qualification to the right in this section, is that the improvement shall not interfere with the navigation of the stream. There is no allegation or proof of such an interference, and therefore it is not to be considered.

" We have not noticed the second proposition which was argued, to wit: How far the defendant is estopped from controverting the complainants' title? We have shewn that the latter's title was good, and it is therefore unnecessary for him to invoke such a principle to sustain himself. We do not intend to decide whether the complainants' interest in the premises as riparian proprietor is a proper subject for a lease, or whether the doctrine of estoppel as growing out of the relation of landlord and tenant is applicable to this case. We have, however, in the view we have taken of this transaction, laid great stress upon the relations existing between the parties. And while we do not say that an *actual* fraud was contemplated, as the party may have innocently adopted this mode of procuring the settlement of a question of law, yet we do think that to allow one party to a contract to appropriate those fruits of it to himself which were intended for the other; to avail himself of it as long as it suited his purpose and then to repudiate it, would be countenancing the grossest kind of legal fraud, and no Court of Equity could tolerate it.

"It only remains for us to add that all the material allegations of the bill have been either admitted or

proved. The complainants have fully established their exclusive right of making improvements into the waters of the Annamessex River in front of their tract of land called 'Honesty,' and that the respondent is taking steps to interfere with that right in a manner that is inequitable and oppressive. We are satisfied that the issuing the patent which the respondent is asking for in the Land Office, would confer no valuable right upon him in the face of the 39th section of the 54th Article of the Code, but in the language of the Chancellor, in *Chapman vs. Hoskins,* ' would hang like an incubus on the rights' of the complainants, and that the law provides no adequate remedy in the premises.

"The complainants are therefore entitled to the relief which they ask, and we will decree accordingly."

A decree was passed accordingly, from which the defendant appealed.

The cause was argued before BARTOL, C. J., STEWART, BRENT, MILLER and ALVEY, J.

*John H. Handy,* for the appellant.

*J. W. Crisfield,* for the appellees.

BARTOL, C. J., delivered the opinion of the Court.

The facts of this case are fully stated, and the several questions involved are discussed with much ability and clearness in the opinion of the Circuit Court, sent up with the record, and as we concur in the conclusions therein expressed, it will not be necessary for us to enter into any extended or elaborate discussion of the same questions. These, as succinctly stated by the Circuit Court, are:

"1st. What are the rights of the complainants in the premises in question?"

"2d. How far is the defendant estopped by his contract of May 24th, 1867, and his acts in pursuance thereof, from controverting the complainants' title?"

"3rd. Has the Court jurisdiction in the premises?"

1. Upon the question of jurisdiction, which is first discussed in the opinion of the Circuit Court, we entirely agree with the views therein expressed, and for the reasons therein so well stated. The principle that "when a subject-matter of controversy is already in possession of a Court of competent jurisdiction, its action will not be interfered with by any other Court of concurrent jurisdiction" has no application to the present case.

The Commissioner of the Land Office, although declared by the Code, (Art. 54, sec. 1,) to be a "Court of Record," and though he is clothed with certain functions and powers in their nature judicial; yet as was said in *Smith's Lessee vs. Devecmon,* 30 *Md.,* 473, "that officer does not form any part of the judiciary under the Constitution." In that case it was decided, that his powers and duties are subject to be changed or modified by the Legislature. In like manner the proceedings before him may be reviewed or controlled by the judicial tribunals of the State. *West vs. Jarrett,* 1 *H. & J.,* 538. In our judgment the pendency of proceedings before the Commissioner, with a view to obtaining a patent, whether upon a caveat or otherwise, does not oust the jurisdiction of chancery over the same subject-matter.

It is true that in ordinary cases, the Courts will not interfere by injunction or otherwise with proceedings pending before the Commissioner, but will leave parties to their usual remedies by appeal from his decision, and by resort to the legal tribunals after a patent may be issued. But we think in this case, the appellees were entitled to relief by injunction. From the nature of the rights claimed by them, the situation of the parties, and the condition of the property in question, it is very clear that no adequate

remedy could be afforded to the appellees by proceedings at law. We concur, therefore, in the opinion of the Circuit Court, that the objections to the jurisdiction made by the appellant are not well taken.

2nd. In our opinion the doctrine of estoppel applies to the appellant with great force.

Nothing is better settled than that every tenant is absolutely estopped and precluded from disputing the title of his landlord, under whom he holds. Here the relation of landlord and tenant exists between the parties. *Anderson vs. Critcher*, 11 *G. & J.*, 450. The appellant is actually in possession of the premises under and by virtue of his contract of May 24th, 1867. Under that contract he has gone on to reclaim the property in question from the water in front of the appellees' land, and by their license and permission has made improvements; and now to allow him to repudiate his contract, and to appropriate to himself that which he has agreed shall belong to others, would be a fraud which a Court of Equity could not sanction.

3rd. But the rights of the appellees do not rest alone upon this ground. By the Code *Art.* 54, *sec.* 38, there is secured to them as riparian proprietors, the exclusive right of making improvements into the waters in front of their lands, and such improvements when made belong to them as incident to their estate. This is a valuable right which other persons cannot lawfully destroy or interfere with. Where such rights existed under the Acts of 1745 and 1784, it has been held that no patent ought to be issued for the land covered by water, in front of the property of the riparian proprietor, so as to interfere with its prospective enjoyment by him; and this was decided before the passage of the Act of 1862. *Chapman vs. Hoskins*, 2 *Md. Ch. Dec.*, 485, approved in *Patterson vs. Gelston*, 23 *Md.*, 448. In the exercise of this right of improvement, the riparian proprietor is not restricted except by the provi-

sion, "that the improvements so made shall not interfere with the navigation of the stream of water, into which the said improvement is made." *Code, Art.* 54, *sec.* 38.

In this case there is no evidence that this provision has been violated; and it may be questioned whether such an objection could be urged by the appellant, by whom the improvement has been made under his contract of May 24th, 1867. But as we have said, it does not appear in this case, that the navigation of the river has been interfered with by the improvement in question.

It has been argued on the part of the appellant, that by the true construction of the Code, Art. 54, secs. 37 and 38, the right of the riparian proprietor to make improvements, extends only to the thread or middle of the river, "*ad medium filum aquæ*," as in the case where the land bounds upon water not navigable; and it has been contended that in this case, the improvements in question extend nearer to the opposite shore, than they are to the land of the appellees, and therefore cannot legally be claimed by them. This fact is not alleged in the answer, nor does it appear by the plats or other proof in the cause. But we are of opinion that this is not the true construction of these sections of the Code.

The law which applies to riparian proprietors upon waters not navigable, and which defines their proprietary rights by the thread of the stream, has no application to navigable waters; and the Code is not to be construed so as to apply this doctrine to improvements made in navigable waters. It often happens that the channel or deep water lies much nearer to one bank than to the other, and that on one side, the flats or shallow water unfit for navigation may extend a considerable distance from the shore. Now in such case, the right to improve has no reference to the thread or middle of the stream; but is limited and defined, as we have seen, with reference to the rights of navigation, and is to be exercised "*so as not to interfere with the navigation of the stream.*"

Again in making the improvements, the proprietor is not compelled, as has been argued, to commence them at the shore, but may begin at the outer extremity of the projected improvement, and extend the same to the bank of the river, which it clearly appears was the design in the present case.

The Code provides that such improvements "shall pass to the successive owners of the land to which they are attached, as incident to their estate." It does not follow from this, that the title to the improvements when made, may not be severed from that of the mainland, and be conveyed to and held by other persons having no interest in the original tract. The right of the riparian proprietor to such improvements, necessarily carries with it such power of alienation as owner thereof.

We agree with the Circuit Court in the opinion that the conveyance by the appellees of the lot of ground to Isabella F. Goodman, dated May 6th, 1871, conferred upon her no riparian rights, or rights to make improvements into the water in front of her lot, which would be in conflict with, and would destroy the rights here claimed by the appellees. That deed conveyed by metes and bounds "*a lot of ground in the Town of Crisfield, being part of block No.* 19 *on the plat of said Town,*" and must be construed with reference to said town-plat; from which it plainly appears that no riparian rights whatever were conveyed, or were intended to be conveyed by the deed. For although at the date of the deed, the lot was upon the water, the plat shows that the parties contemplated that the contiguous water should be filled up and made fast land.

For these reasons as well as for those which are stated more at length in the opinion of the Circuit Court, we think the appellees were entitled to the relief prayed in their bill. The order appealed from will be affirmed and the cause remanded, to the end that the injunction may be issued.

*Order affirmed.*

(Decided 3rd June, 1875.)